LAUREL COTTON MILLS *v.* GULF & SHIP ISLAND RAILROAD
COMPANY.

1. INTERSTATE COMMERCE. *Intrastate shipments. Agreement as to rates.*
   *Discrimination. Code* 1892, §§ 4287, 4290.
   A contract by a railroad company to maintain rates from a fac-
   tory, not exceeding to competitive points the rates from other
   factory towns, is not on its face void for discrimination, under
   the Interstate Commerce Act of February 4, 1887, 24 Statutes
   'at Large, 379; nor Code 1892, §§ 4287, 4290.

2. SAME. *Milling in transit.*
   A contract by a railroad company to credit to freight charges on
   manufactured goods any freight received on raw material
   shipped to the factory, is a milling-in-transit agreement, and
   does not violate the statutes mentioned above.

3. SAME. *Code* 1892, § 4292.
   The Interstate Commerce Act, sec. 6, and *Code 1892*, § 4292,
   providing for the publication by railroads of schedules of rates
   and forbidding deviations therefrom, do not render invalid a
   contract by a railroad company to charge no greater rate from
   a factory to competitive points than is charged from other
   places, nor prohibit the maintaining of a milling-in-transit
   agreement, in the absence of any showing that the rates fixed
   by the contract were different from the approved rates, or that
   any schedule of rates had been submitted to the commission
   at all before the contract was made.

4. SAME. *Approval of rates. Burden of proof.*
   The burden is not on the plaintiff to show, in a suit against a
   railroad for breach of contract to transport freight at a specified
   rate, that the contracted rate had been filed with the Interstate
   Commerce Commission or approved by the State Railroad
   Commission, as required by the Interstate Commerce Act, and
   Code 1892, § 4292.

FROM the circuit court of Jones county.

HON. JOHN R. ENOCHS, Judge.

The Laurel Cotton Mills, appellant, was plaintiff, and the
Gulf & Ship Island Railroad Company, appellee, defendant
in the court below. From a judgment sustaining a demurrer

to the declaration and dismissing the suit the plaintiff appealed to the supreme court.

The suit was originally begun in the circuit court of, first district, Hinds county, but by consent of parties the venue was changed to the circuit court of Jones county. The suit was for an alleged breach of the following written contract— viz. :

"This memorandum of contract, made this seventh day of February, 1900, by and between the Laurel Cotton Mill Company, a corporation under the laws of the state of Mississippi, of Laurel, Mississippi, party of the first part, and the Gulf & Ship Island Railroad Company, of Mississippi, party of the second part,

"Witnesseth : The Laurel Cotton Mill Company, or party of the first part, proposes to construct and operate a cotton mill at Laurel, Jones county, Mississippi, and in consideration of the covenant herein agreed to be kept and performed by the parties of the second part, it agrees to locate and build the said cotton mill and warehouses belonging to same on the ground now staked out as agreed upon, accessible from the said Gulf & Ship Island Railroad Company, and further agrees to furnish the right of way for necessary switches to connect the track of the Gulf & Ship Island Railroad from both directions with the cotton mill grounds and buildings.

"The party of the second part, in consideration of the perform-ance of the above-named covenant of the party of the first part, agrees to maintain in effect rates on manufactured goods pro-duced by the said Laurel Cotton Mills, not exceeding, to com-petitive points, the rates effective from Stonewall and Meridian, Mississippi, on the dates.

"And further agrees to maintain in effect a milling-in-transit arrangement for the cotton to be manufactured at the said Laurel Cotton Mills—that is to say, any freight charges that may be paid on cotton shipped from stations between Hattiesburg and Jackson, or on the Laurel Branch on the lines of the said

Gulf & Ship Island Railroad Company, to the Laurel Cotton Mills, shall be allowed and credited, pound for pound, as part payment of freight charges on the manufactured goods or products when shipped to market over the lines of the said Gulf & Ship Island Railroad Company. This arrangement to continue for a period of ten years.

"Party of the second part further agrees to deliver at New Orleans rates all materials, machinery, and supplies used in the construction of the said cotton mills as first built, or future additions thereto of main buildings, or additional machinery, that increases the capacity of the plant, when shipped from points north or east of Birmingham, and in case coal should be required by the said Laurel Cotton Mills, and provided they wish to ship same by the New Orleans & Northeastern Railroad to Laurel, the charges for switching from said railroad to the Laurel Cotton Mills shall not exceed two dollars and fifty cents ($2.50) per car.

"In witness whereof the said parties have hereunto set their hands on the day and year first above written:

"[Signed] LAUREL COTTON MILLS.

"GULF & SHIP ISLAND RAILROAD COMPANY."


*Howe, Spencer & Cocke,* and *Catchings & Catchings,* for appellant.

It will be seen at a glance that the rates provided for by the contract are not by its terms made exclusive. In other words, so far as the contract is concerned, the Gulf & Ship Island Railroad Company is at liberty to give the same rates to any other cotton factory, or, indeed, to any other industry of any kind whatsoever, or, if it thinks best, to give even lower rates to other persons. Its only purpose and its only effect is to guarantee to the Laurel Mills that it shall, during the period of its currency, enjoy a certain rate without the least regard to the rates enjoyed by other persons.

It will also be seen that so far as the contract is concerned, the rate provided for is not a secret rate, but that it may, without offense to the provisions of the contract, be published and made known to all the world. It further appears that the rate provided for is not based upon any other rate—that is to say, the Laurel Mills are not promised a rate less than, or in any way different from, the published rates; and that so far as the contract is concerned, the rates provided for may in fact be the published and established rates.

It should also be noted that it appears from the very face of the contract that the rate provided for was not intended to, and could not, go into immediate effect. The consideration of the contract was the future building of the Laurel Mills, and of course no shipments could be made by the mills until they were built.

A mere glance at secs. 2 and 3 of the interstate commerce act suffices to demonstrate that their purpose and effect were not to render unlawful all discriminations. Under sec. 2 the discrimination to be unlawful must be between shippers of "a like kind of traffic under substantially similar circumstances and conditions," while under sec. 3 to be unlawful the discrimination must subject some particular person or locality to "an undue or unreasonable prejudice or disadvantage." It is too plain for argument that the expression of these qualifications is an affirmance that it was not intended to render all discriminations unlawful. This has been held many times by the courts. *Texas & Pacific Ry. Co.* v. *Interstate Commerce Commission,* 162 U. S., 197; *Interstate Commerce Commission* v. *Ala. M. R. Co.,* 168 U. S., 177.

Not only does the contract here in controversy not show, in the light of these decisions, an undue or unreasonable preference or discrimination, but it does not even show a preference or discrimination, whether just or unjust.

The supreme court has held that the question of unjust discrimination is a question of fact. How, then, could such a ques-

tion be determined on demurrer to a declaration which discloses none of the facts which the supreme court says must be taken into consideration? *McNees* v. *Railway Co.,* 22 Mo. App., 224; *Bayles* v. *Kansas Pacific R. Co.,* 22 Pac. Rep., 341.

Certainly, we think, under the decisions in *Louisville & Nashville R. R. Co.* v. *Commonwealth of Kentucky,* 57 S. W., 508; *Hoover* v. *Penn. R. R. Co.,* 47 Atl., 283 (s. c., 156 Pa. St., 220); *Commonwealth* v. *L. & N. R. R. Co.,* 68 S. W., 1103, the rate provided for in the contract would be justifiable as against all other persons who are not in precisely the same condition as the Laurel Cotton Mills. In those cases it was expressly declared that it was not an undue preference to give a manufacturing establishment a rebate on the coal to be consumed by it which was denied to dealers in coal, inasmuch as a manuacturer was not a competitor in the business of dealing in coal with a coal dealer and inasmuch as the railroad expected increased compensation for handling the manufactured products. If it was allowable to give a rebate to manufacturers on coal consumed by them in manufacturing, it would of course be allowable to haul their coal free. In those cases, and we think their reasoning unanswerable, it was held that the railroads had the right to make the contracts in question, as they resulted in establishing important manufacturing industries on their lines whose products they would haul to market; that the manufacturing concerns as purchasers of coal not being competitors with dealers in coal, and not being shown that they had any rivals in the manufacturing business to whom the rebates were denied, the result of the contracts was to benefit the manufacturers and the carriers without injury to other persons. We invite the careful attention of the court to these cases, as we regard them as of the highest importance in illustrating what is meant by unjust discrimination.

It is difficult to see how the question of legality, under sec. 6, can be raised on demurrer in view of the fact that neither

the contract nor the declaration contains a word or a line on the subject of the filing of rates.

Aside from the question of pleading the primary and radical defect of appellee's argument seems to be the idea that the rate published as required by sec. 6 must be rigidly and unqualifiedly uniform. As we have seen, the whole act must be construed together, and secs. 2 and 3, by prohibiting unjust discriminations, impliedly authorize discriminations and preferences which are just. Indeed, the whole question of uniformity is exhausted by secs. 2 and 3. The whole and only purpose of sec. 6 being to require publicity, the rates published in accordance therewith can contain rebates and discriminations *ad libitum,* and that section will not be offended.

Altogether, aside from the question of pleading, we deny that there can be any presumption that the appellee has filed any rates with the interstate commerce commission. The court will take judicial notice that the Gulf & Ship Island Railroad is wholly within the limits of the State of Mississippi. It has been repeatedly held, and necessarily so, that the interstate commerce law and the interstate commerce commission have no application to and no concern with rates other than inter-state rates. The Gulf & Ship Island Railroad can have no inter-state rates unless it makes joint rates with some other carrier. The interstate commerce act does not require carriers to make joint rates; it merely provides that when such rates are made they shall be filed, published, and observed. *Chicago & N. W. R. R.* v. *Osborne,* 52 Fed., 912; *Gulf, Etc., Ry. Co.* v. *Nelson,* 23 S. W., 732.

Even therefore assuming appellee's argument to be correct, that because the statute creates a duty to file rates, it must be presumed to have been done, the Gulf & Ship Island Company cannot be presumed to have filed joint or interstate rates, because it was under no obligations to make them. Thus giving full effect to the presumption invoked by appellee, however inconsistent, it cannot render the contract rates violative of

sec. 6, because as to the making of joint rates no duty exists and the presumption cannot therefore apply.

It is important also to remember that the interstate commerce commission has no power to fix rates. *C., N. O. & T. P. Ry. Co.* v. *I. C. Com.,* 162 U. S., 184; *I. C. Com.* v. *C., N. O. & T. P. Ry. Co.,* 167 U. S., 479.

Sec. 6 does not render invalid a promise to give a certain rate because at the time the promise was made some different rate was in force and effect and was filed and published as required by law. It simply provides that so long as one rate is filed and published no different rate can be charged. It follows from this that even assuming that at the date of the contract a rate different from the rate promised to be given was filed, the contract was not thereby rendered invalid. While the old rate was filed the promised rate could not be given, but the promise remained none the less valid and binding, though temporarily unenforceable. It would become not only valid, but actually enforceable, as soon as the rate agreed upon should be filed and published in accordance with the duty resting upon the appellee.

The declaration is demurred to because of its alleged violation of § § 4287, 4290, 4291, 4292, and 4293, Code 1892. Does the contract violate secs. 4287, 4290, or 4291?

In discussing secs 2 and 3 of the interstate commerce act we have already gone fully into the question of discriminations, just and unjust, and have shown that it is only unjust discriminations which are prohibited by that law. We have discussed fully, too, what is meant by the term "unjust discrimination," and it is not our purpose to again go into that question. We can, we think, demonstrate that it is only unjust discriminations which are forbidden by the laws of Mississippi, and that upon this subject they are practically identical with the laws of the United States. We will therefore merely refer to our prior argument for illustrations of what discriminations are unjust. It may be well, however, to reiterate what we have already said

in regard to the peculiar provisions of the contract in question —viz., that it contains not the slightest indication on its face that it is discriminating, and that so far as appears the rates thereby promised may be given to every shipper on defendant's road.

The only possible distinction which can be drawn between secs. 4287 and 4290 and secs. 2 and 3 is that at a first glance sec. 4287 seems to make illegal "any discrimination" without the qualification contained in secs. 2 and 3, that to be illegal it must be unjust.

When the exact language is considered, however, the apparent distinction is seen not to exist:

"If any railroad shall, for its advantage, or for the advantage of a connecting line, or for that of any person, locality, or corporation, make any discrimination in transportation against any person, locality, or corporation, unless authorized by the commission," etc.

Thus to be unlawful a discrimination must be made for the advantage of one person and against another person, or, in other words, must be unjust discrimination. For the test of injustice is whether or not some person gains an advantage at the expense of or against another. This can only occur where the shippers, by reason of the similarity of their situations, are entitled to fare alike. That this is the correct interpretation of sec. 4287 is shown by sec. 4290, which directs the commission to inquire in considering rates "whether or not discrimination be made improperly against any person, corporation, or locality."

This is further shown by sec. 4297, which directs the commission to inquire whether any rates "operate so as to effect unjust discrimination," and is conclusively shown by sec. 186 of the constitution of Mississippi, which is as follows:

"The legislature shall pass laws to prevent abuses, unjust discrimination, and extortion in all charges of express, telephone, sleeping car, telegraph, and railroad companies, and shall enact

laws for the supervision of railroads, express, telephone, telegraph, sleeping car companies, and other common carriers in this state by commission or otherwise, and shall provide adequate penalties to the extent, if necessary for that purpose, of forfeiture of their franchises."

It will be seen from this that the power of the legislature is limited by the constitution to the prevention of unjust discrimination only. It was not intended to confer upon the legislature the power to prevent all discriminations, and the common law rule in this regard is fully recognized and established by this provision of the constitution, for under the common law carriers are not allowed to make unjust discriminations. In other words, this section of the constitution merely requires the legislature to see that the common law rule as to discriminations is enforced. The precise question was before the supreme court of Illinois in the case of *Chicago & Alton R. R. Co.* v. *People, ex rel Koener,* 67 Ill., 11. The constitution of Illinois contained the following provision:

"The general assembly shall pass laws to correct abuses and prevent unjust discrimination and extortion in the rates of freight and passenger tariffs on the different roads in the State, and enforce such laws by adequate penalties to the extent, if necessary for that purpose, of forfeiture of their property and franchises."

A law which had been passed by the legislature of Illinois, forbidding any discrimination whatever, whether just or unjust, was declared by the supreme court of that state to be void upon the ground that the constitution only empowered the legislature by suitable laws to prevent unjust discrimination.

Commenting upon a similar provision of the Colorado constitution, the supreme court of that state in *Bayles* v. *Kansas Pac. Ry.,* 13 Col., 181, said:

"While this provision remains in force, it may well be doubted whether this court or the legislature can declare that a railway company shall not discriminate in charges at all, or that

mere inequality in rates shall constitute an undue or unjust discrimination."

The supreme court of Kentucky in the case of *Louisville & Nashville Ry. Co.* v. *Commonwealth*, 46 S. W., 702, in speaking of a provision of the Kentucky constitution, said:

"For the authority given to the legislature to so regulate transportation by general law as to prevent unjust discrimination is a recognition of the expediency and justice of authorizing discrimination deemed just."

If by reason of the constitutional prohibition the legislature cannot prohibit all discriminations, it cannot provide that no discrimination, whether just or unjust, shall be made unless authorized by the commission; for this would be to enable the commission, by refusing its consent, to in effect prohibit all discriminations, and certainly the legislature cannot authorize or empower the commission to do what it cannot itself do.

In view of these considerations we submit with the utmost confidence that the Mississippi statutes, like the Federal statutes, are merely declaratory of the common law, so far as they relate to unjust discrimination, and that the contract in question cannot offend the one unless it offends the other, if it be assumed that both apply.

We think we have shown that upon the present pleadings at least the court cannot find that unjust discrimination has been made. Does the contract violate secs. 4292 and 4293?

It is manifest that the purpose of secs. 4292 and 4293, in connection with sec. 4287, was precisely the same as that of sec. 6 of the interstate commerce act. Section 4287 prohibits a railroad from charging more than the rate fixed or approved by the commission; sec. 4292 prohibits the charging of less, by any device; and sec. 4293 imposes a penalty upon a railroad for permitting such deviation. The net result is to require railroads to charge only the rates fixed or approved by the commission, when in fact any rates have been so fixed or approved. The test of illegality under these sections is the

same as under sec. 6.   In either case two facts must concur:
(1) A rate fixed or approved, and (2) the charging of a less
or greater rate.   The only difference is that under the Missis-
sippi law the commission has power to permit a deviation, while
under the Federal law the rates when filed and published can-
not be deviated from even with the consent of the interstate
commerce commission.   The difference is to be accounted for
by the fact that the state commission has the power to fix rates.
while the interstate commerce commission has no such au-
thority.

In discussing these sections we may therefore make exactly
the same argument we made as to sec. 6.   There is not a word
or line in the contract or declaration upon the subject of the
fixing or approving of rates by the commission.   The Missis-
sippi laws, like the Federal statutes, do not prohibit special
contracts or special rates.   The constitutional recognition that
discriminations may be just, necessarily implies that when just
they may be made.   The Gulf & Ship Island Railroad can file
such rates as it pleases within the charter limits.   *R. R. Com.
v. G. & S. I. R. R. Co.,* 78 Miss., 750.   If, therefore, it is to
be presumed that rates have been filed because the statutes im-
pose a duty to file rates, it must be presumed that the whole
duty was performed, and that therefore the schedules so filed
contain an announcement that the Laurel Mills are entitled to
the rates specified in the contract.   As we said before, the
milling-in-transit feature of the contract rates was actually
given up to March, 1902.   If it was given without being filed
with the commission, the law was violated.   Counsel for de-
fendant ask the court to presume that the law was complied
with, and this presumption necessarily carries with it the idea
that the contract rates were filed when given.   If because rates
were given to the public generally it must be presumed that
those rates were "fixed or approved," then because the contract
rates were given to the Laurel Mills it must be presumed that
they, too, were "fixed or approved."

Counsel cannot be permitted to split the presumption they invoke in two parts and adopt the portion that helps them while they repudiate the portion that injures them.

Much stress was laid on these sections in the argument below, which proceeded upon the theory that their purpose and effect was to make all rebates unlawful unless authorized by the commission. The fallacy of this construction, however, is shown by the very language used. It is not "rebates," as such, which are prohibited, but only "rebates or reductions from the tariffs of charges fixed or approved by the commission." If, therefore, no tariffs of charges have been fixed or approved by the commission, no rebates are unlawful under this section.

If the sections relating to discrimination had been omitted, the tariffs of charges filed could contain any number of unjust rebates or unjust discriminations. The only purpose of these sections is to secure adherence to the filed and published rates by prohibiting the charging of less than these rates. They apply not only to rebates or reductions in favor of one person, but to rebates and reductions in favor of the public as a whole. Under sec. 4292 no railroad can reduce its tariffs without the consent of the commission, but it can hardly be argued that the purpose of the law was to make it unlawful for railroads to lower their charges. That the chief purpose of this section is merely to prevent charging of less than the rates fixed or approved by the commission is shown by the fact that, while sec. 4287 prohibits the charging of more than those rates, sec. 4292 is the only section of the code which forbids the charging of less. In our opinion sec. 4292 would have precisely the same effect if it had merely forbidden the charging of less than the fixed or approved rates. Indeed, the word "rebate" is used as synonymous with "reduction."

Moreover, as the constitution recognizes that discriminations may be just, it would not have been competent for the legislature to have forbidden rebates altogether or to have put it in the

power of the commission, by refusing its consent, to itself forbid them whether just or not.

A rebate can never be objectionable unless it is unjustly discriminating; for, as has been well said in a number of cases, it is but the fixing of an ultimate rate. The legislature's power is limited to the prevention of abuses and unjust discriminations, and, as we have said, rebates are not abuses unless they constitute unjust discriminations. It follows that the only rebates the legislature can forbid are unjust rebates.

The case of *Union Pac. Ry. Co.* v. *Goodridge,* 149 U. S., 680, was much relied on in the circuit court, and was cited as authority for the proposition that it is competent for a state legislature to provide that all rebates shall be unlawful unless first authorized by the state commission. A careful reading of the opinion will show that no such point was involved and no such ruling made. The Colorado constitution and statutes do not forbid rebates and special contracts, but provide that they shall be open to all "upon like conditions and under similar circumstances," with a power in the commission, however, under certain circumstances, to permit rebates, which would therefore be otherwise void for unjust discrimination. The court had before it a rate which it expressly held to be unjustly discriminating, and it decided that, as the consent of the commission had not been first obtained, it was void. The statute did not provide, and the court did not hold, that a rebate which was not unjustly discriminating had to be first approved by the commission. The whole utterance of the court upon the subject is directed against unjust discriminations.

So far from being more rigid than sec. 6, sec. 4292 is more liberal. For under the former no deduction can, under any circumstances, be made from the published rate, while under the latter such deduction can be made with the consent of the commission.

It is not sufficient to bring the contract within the condemnation of sec. 4292 to show that it provides for a rebate. It must

be shown that it provides for a rebate from the rates fixed or approved by the commission.

Indeed, even this would not make the contract illegal.   As we have said before, the contract was not to go into immediate effect.   Therefore the appellee could have, and it was its duty, before any shipment was made, to have filed with the commission a schedule showing the contract rates, and as the commission has no power to fix its rates, they would have gone into immediate effect, subject to be attacked on the score of unjust discrimination.   The court cannot presume that this was not done; but, whether done or not, the legality of the contract would not be affected, for, a contract legal when made, cannot be made illegal by the default of a party thereto, though it may for a time be thereby rendered unenforceable.

"But when the illegality does not appear from the contract itself, or the evidence necessary to prove it, but depends upon extraneous facts, the defense is new matter and must be pleaded, in order to be available."

"In an action on a written contract the contract must be construed on demurrer by the light afforded by the declaration alone, and not by circumstances that may be suggested, but which do not appear in the declaration."   *Stout* v. *Whitney,* 12 Ill., 218.

"The illegality of a contract sued on must appear upon the face of the complaint, or it cannot be taken advantage of by demurrer."   *Fairbank* v. *Leary,* 40 Wis., 644.

"If there was any illegality in the transaction, it should have been pleaded in bar."   *Tyler* v. *Hand,* 7 How., 573.

The rule is, that if a plaintiff, in order to make out a cause of action, is required to show that the contract sued on is, for any reason, illegal, the court should not enforce it, whether pleaded as a defense or not.   But when the illegality does not appear from the contract itself, or from the evidence necessary to prove it, but depends upon extraneous facts, the de-

fense is new matter and must have been pleaded in order to be available." *School District* v. *Sheidley*, 138 Mo., 672.

"Where a contract is fair on its face, the presumption of course is in favor of its legality, and the burden of proving that the consideration thereof was illegal, or that the contract was illegal for any other reason, is upon the party asserting such illegality, and to sustain such a defense it has been held that the illegality must be clearly shown." 15 Am. & Eng. Ency. Law (2d ed.), 1016, and cases cited.

"There is no presumption that a contract is illegal. He who denies his liability under a contract, which he admits having made, must make the fact of its illegality apparent. The burden of showing it wrong is on him who seeks to deny his obligation thereon. The presumption is in favor of innocence, and the taint of wrong is a matter of defense." *McBratney* v. *Chandler,* 22 Kan., 692.

*E. J. Bowers,* and *McWillie & Thompson,* for appellee.

If the contract in question violates either the state or the Federal statutes, it is void *in toto,* for the reason that it is a contract in contravention of a penal statute. Both the state and Federal statutes are aimed at the same clause in the contract—*i. e.,* the clause that provides for the rebate and milling-in-transit arrangement—and if this clause is obnoxious to either, the whole contract fails, because it is inseparable, and the interstate feature cannot be separated from the intrastate feature.

Sec. 4292, Annotated Code 1892, prohibits "any rebate or reduction from the tariffs of charges fixed or approved by the commission, . . . by a change in, or deviation from, the rates so fixed and approved, unless such change or deviation be first allowed by the commission."

Sec. 4293 makes any such rebates, deduction, or change a misdemeanor, and provides a penalty. Sec. 4292 provides that the tariffs should be posted.

We are unable to read these sections without being driven to the conclusion that any rebate made, under any circumstances, without the permission of the commission, is unlawful and punishable as a misdemeanor.

The test of the right to make the rebates, as fixed in sec. 4292, is not the question whether it discriminates against any one, but is whether it has been done with the permission of the commission. Of course we know no such permission has been granted, and the contract, therefore, to give a rebate and to make a change from the fixed tariff, is a violation of the law and a misdemeanor.

These sections contain no suggestion either of discrimination or that the hurt of any one is necessary in order to constitute any offense, but the giving of the rebate, and the making of the deviation or change, without the consent of the commission, is denounced as criminal. In other words, this sec. 4292 is exactly the same as the Elkins law, which forbids any deviation from the published rate.

Turning from the state to the Federal statute, we find the following:

Sec. 2 of the interstate commerce act forbids the "charging, demanding, or collecting from any person or persons a greater or less compensation for any service rendered, or to be rendered, . . . than it charges, collects, demands, or receives from any other person or persons for doing a like service in transportation of a like kind of traffic, under substantially similar circumstances and conditions."

In a note to this section, in a work styled "Interstate Commerce Law, Annotated," we find that the interpretation of this act by the American courts has been very different from that of the English act by the English courts, in that the latter has always required a specific intent to discriminate and injure, whereas no such intent is necessary under the American act. See 3 I. C. C. Rep., 624; 2 I. C. C. Rep., 120.

"Classification is recognized by the commission as necessary, but when used as a device to accomplish unjust discrimination, it subjects the parties to the penalty of the law." *Cox* v. *The L. V. R. R. Co.,* 4 I. C. C. Rep.; 3 I. C. C. Rep., 460.

"Where classifications of rates are involved as to one particular article of freight, it is proper to compare the rate in question with that of other articles similar in value, bulk, cost of carriage, and the like; and it is not necessary that such articles should be competitive." *Harvard Co.* v. *Penn. Co.,* 4 I. C. C. (3 I. C., 257); *Beaver* v. *P. C. & L. R. R.,* 4 I. C. C. (3 I. C., 564).

For a case of unjust discrimination by special rates on soaps of different grades, see *Pyle* v. *E. T., V. & G. R. R. Co.,* 1 I C. C., 465.

"It is not a valid excuse for failure to furnish cars to complain that such cars may be more profitably employed; such selection of goods is forbidden to common carriers." *Riddle et al.* v. *N. Y., L. E. & W. R. R. Co.,* I. C. C., 495. For free cartage case, see *Stone* v. *D., G., H. & M. R. R.,* 3 I. C. C., 613.

"The term, 'a like kind of traffic,' as found in sec. 2 of the act, does not mean traffic which is identical, but it means traffic which is like the elements upon which a fair and just classification is founded, and in the elements to be considered in the determination of what is a just and reasonable rate, and as to what are just and reasonable regulations." *N. Y. B. of T. et al.* v. *Penn. R. R. Co. et al.,* 4 I. C. C. (3 I. C. C., 417).

The term, under substantially similar circumstances and conditions, is used in the same sense both in the second and fourth sections of the act.

Note sec. 3 of the law, which is as follows:

"That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm or corporation, or locality, or any particular de-

scription of traffic, in any respect whatever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatever."

We call attention especially to the fact that this forbids any preference or disadvantage to any particular description of traffic.

This view, in connection with the citation just above, establishes the theory that a discrimination in favor of one class as against another class is as much denounced by the law as a discrimination in favor of one of a class as against others of the same class. It is unlawful to discriminate in favor of one as against others of the same class. And it is equally unlawful to select one class of freight, or one class of shippers, and make them special favorites by making special facilities, giving special advantages, rebates, or the like.

Sec. 6 of the Federal statutes provides that every common carrier engaged in interstate commerce shall print and keep open to public inspection schedules, showing the rates, fares, and charges for the transportation of passengers and property, which said schedules shall be plainly printed in large type and posted in two public or conspicuous places in its depot, station, or office; and clause "e" of the same section provides that copies of all schedules, rates, fares, and charges shall be filed with the commission. The third and fourth paragraphs of said section are as follows:

"Notice of change of rates. No advance shall be made in the rates, fares, and charges which have been established and published as aforesaid by any common carrier in compliance with the requirements of this section, except, after ten days public notice, which shall plainly state the changes proposed to be made in the schedule then in force, and the time when the increased rates, fares, or charges will go into effect; and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules

in force at the time and kept open to public inspection. Reductions in such published rates, fares, or charges shall only be made after three days' previous public notice, to be given in the same manner that notice of an advance in rates must be given."

"Published rates not to be deviated from. And when any such common carrier shall have established and published its rates, fares, and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares, and charges as may at the time be in force."

The prohibition against advancing or lowering any rate without notice, contained in paragraph three, and the provision of paragraph four, making it unlawful for such carrier to "charge, demand, collect, or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any service in connection therewith, than is specified in the published schedule of rates, fares, or charges as may at the time be in force," operate to prohibit absolutely, and without qualification, any deviation whatever from published rates. They are tantamount to section 4292 of our law, which prohibits the making of any rebates.

The question raised under this section is not whether the discrimination is a lawful or unlawful one, nor whether the character of the traffic is substantially the same, or carried on under substantially similar conditions, but is the express prohibition against any deviation whatever from the rate established and fixed in the published tariff of charges filed with the commission and posted as required by law. The object of this section is to prohibit deviations from published rates, and is

wholly disconnected from the prohibition against unlawful discriminations. An unlawful discrimination might easily be made by means of an established printed rate—that is, the rates might be so arranged and published as to operate unjustly and unfairly against a particular shipper or class of shippers, or a locality or section of the country; and still so long as the carrier adhered to the rate he would not be guilty of a violation of this section and could not be prosecuted under it.

The cases cited by appellant all deal with discriminations, and are none of them pointed at these clauses. It is apparent that one of the objects sought to be obtained by the law was certainly publicity and fixedness of rates, and to secure this section 6 was enacted.

Of course it is clear that any contract violative of law or public policy is void. *Bohn* v. *Lowry,* 77 Miss., 424; Black on Interpretation of Laws, 64.

"The authorities all agree that those contracts are illegal which rest upon a consideration that is fraudulent, against morality, or against the principles of some public policy, or in contravention of some statute." 2 Beach on Contracts, sec. 1415.

Argued orally by *O. W. Catchings,* for appellant, and by *T. A. McWillie,* and *E. J. Bowers,* for appellee.

TRULY, J., delivered the opinion of the court.

On the 7th day of February, 1900, the Laurel Cotton Mills, a domestic corporation, intending to construct and operate a cotton mill at the city of Laurel, on the line of the Gulf & Ship Island Railroad Company, entered into a contract with said railroad company by which it agreed and obligated itself to locate and build its said cotton mill and warehouses on certain grounds previously staked out and agreed upon, accessible from said railway, and to furnish the right of way for all

necessary switches from both directions to connect the track of said railroad company with the cotton-mill grounds and buildings. In consideration of the performance of this covenant, the Gulf & Ship Island Railroad Company agreed on its part, by said contract, "to maintain in effect rates on manufactured goods produced by the said Laurel Cotton Mills, not exceeding, to competitive points, the rates effective from Stonewall and Meridian, Mississippi, on the dates," and "to maintain in effect a milling-in-transit arrangement for the cotton to be manufactured at the said Laurel Cotton Mills—that is to say, any freight charges that may be paid on cotton shipped from stations between Hattiesburg and Jackson, or on the Laurel Branch, shall be allowed and credited, pound for pound, as part payment of freight charges on the manufactured goods or products when shipped to market over the line of the said Gulf & Ship Island Railroad Company. This arrangement to continue for a period of ten years." This contract was duly signed by both the contracting parties. After its execution the Laurel Cotton Mills proceeded with the construction of its factory, and on April 1, 1901, began business; its said mill having been fully completed, and being then in full operation. From this date until the 1st of March, 1902, the Gulf & Ship Island Railroad Company observed on its part the stipulation of the contract in reference to the "milling-in-transit arrangement," as therein agreed upon. After that time it refused further to credit the freight charges paid on raw cotton on the shipment of manufactured goods made over its line by the appellant, as provided by the terms of the contract. At the date of the contract, and at all times subsequent thereto, there were established and in operation at Stonewall and Meridian, in this state, cotton mills manufacturing the same class of goods and being engaged in exactly the same line of business as the appellant. The Gulf & Ship Island Railroad Company ignored that provision of the contract by which it had obligated itself to grant to appellant rates on manufactured goods "not ex-

ceeding, to competitive points, the rates effective from Stonewall and Meridian" on the date of shipment, but imposed on the shipments made by appellant greater rates to competitive points than the mills located at the two places mentioned were required to pay on shipments made by them to the same points. This condition of affairs continued until January, 1903, when the appellant filed its declaration setting out the above facts. It filed therewith a bill of particulars showing the amount of freight paid on raw cotton, and which it was entitled to have had credited on the freight charges on its shipment of manufactured goods under the milling-in-transit arrangement set out in the contract, and also a bill of particulars showing the amount of freight which it had been required to pay on shipments made to competitive points over and above the freight rates in force at the date of such shipments from Stonewall and Meridian to the same points. The bill of particulars showed that of the shipments under the milling-in-transit arrangement, many were interstate shipments from Laurel, in this state, to sundry points beyond this state. To this declaration the appellee filed demurrers, three in number, but presenting substantially but two points—viz., that the contract is void because (1) contrary to the law regulating interstate commerce; (2) contrary to the provisions of Code 1892, governing the supervision of common carriers. These demurrers were by the circuit court sustained, and from that judgment the Laurel Cotton Mills prosecutes this appeal.

The proposition upon which appellee relies may be broadly stated as follows: The contract sued on is void on its face, because it has the necessary effect of creating a discrimination forbidden both by the federal interstate commerce act and our own state statute dealing with the same subject-matter, and for the further reason that this milling-in-transit arrangement which is set out in the contract is the granting of a rebate, the allowance of which is unlawful, under § § 4292, 4293, Code

1892, and sec. 6 of the interstate commerce act (Act Feb. 4, 1887, ch. 104, 24 Stat., 380 [U. S. Comp. St. 1901, p. 3156]).

"Before we consider the phraseology of the statute, it may be well to advert to the causes which induced the enactment. They chiefly grew out of the use of railroads as the principal modern instrumentality of commerce. While shippers of commerce are under no legal necessity to use railroads, practically they are. The demand for speedy and prompt movement virtually forbids the employment of slow and old-fashioned methods of transportation, at least in the case of the more valuable articles of traffic. At the same time the immense outlay of money required to build and maintain railroads, and the necessity of resorting, in the securing of the rights of way, to the power of eminent domain, in effect disable individual merchants and shippers from themselves providing such means of carriage. From the very nature of the case, therefore, railroads are monopolies, and the evils that usually accompany monopolies soon began to show themselves, and were the cause of loud complaints. The companies owning the railroads were charged, and sometimes truthfully, with making unjust discriminations between shippers and localities, with making secret agreements with some to the detriment of other patrons, and with making pools or combinations with each other, leading to oppression of entire communities." We quote this language from the decision of the supreme court of the United States in *Texas & Pacific R. R. Co.* v. *Interstate Commerce Commission,* 162 U. S., 211 (16 Sup. Ct., 666; 40 L. ed., 940), as being as applicable to our own as to the federal legislation for the regulation of commerce and the supervision of carriers.

In dealing with the subject of the supervision of railroads and common carriers generally, the object of the legislation was to benefit and regulate commerce by preventing railroad corporations and all other common carriers from unduly favoring one shipper or class of shippers, or one special place, to the injury of other persons and places similarly situate. The

first material inquiry, then, is whether or no the contract under review, in express terms or by necessary implication, presents a case of discrimination, within the meaning and intent of secs. 2 and 3 of the interstate commerce act (U. S. Comp. St., 1901, p. 3155), and §§ 4287, 4290, Code 1892. The object which both statutes referred to had in view was practically the same, and as stated—*i. e.,* to prevent unjust discrimination being made in transportation against any person, locality, or corporation. It must be noted that this discrimination must be unjust between shippers, persons, localities, or corporations, by granting undue preference to one or subjecting another to unreasonable disadvantage. The evident meaning of the federal statute—and we think the same is true of our own—is that the discrimination condemned must have the effect of unduly favoring some individual, class, or place at the expense and to the prejudice and disadvantage of some other shipper or place, where the services rendered were "like and contemporaneous," and where the transportation was effected under "substantially similar circumstances and conditions." *Texas & Pacific R. R. Co.* v. *Interstate Commerce Commission, supra.* All special contracts or traffic arrangements between carrier and shipper are not forbidden or condemned, but only such as operate unfairly and evidence undue favoritism toward one, or deprive another of his just rights. As said in a recent case where the policy, effect, and intent of the interstate commerce act was under review: "Subject to the two leading prohibitions that their charges shall not be unjust and unreasonable, and that they shall not unjustly discriminate, so as to give undue preference or advantage, or subject to undue prejudice or disadvantage, persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers as they were at common law—free to make special contracts looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce, and generally to manage their important interests upon the

same principles which are regarded as sound and adopted in other trades and pursuits." *Cincinnati, N. O. Ry. Co.* v. *Interstate Commerce Commission,* 162 U. S., 184 (16 Sup. Ct., 700; 40 L. ed., 935). "It is not all discriminations or preferences that fall within the inhibition of the statute—only such as are unjust or unreasonable." *Interstate Commerce Commission* v. *Baltimore & Ohio R. R. Co.,* 145 U. S., 263 (12 Sup. Ct., 844; 36 L. ed., 699).

We accept the construction placed on secs. 2 and 3 of the interstate commerce act by the Supreme Court of the United States in the cases cited, and, adopting that construction as applicable to the corresponding provisions of our own statute (§ § 4287–4290, Code 1892), it is made manifest to our minds that all discriminations are not forbidden by either statute, but only "discrimination in transportation against some person, locality, or corporation," made for the advantage of the carrier, or by receiving greater or less compensation from one class of persons than from another for similar services contemporaneously rendered.

The contract under consideration obligates the railroad company to maintain on manufactured goods shipped from Laurel, Miss., rates not exceeding, to competitive points, the rates effective on the dates of the shipments from Stonewall and Meridian, where similar factories were located. We are unable to see that this stipulation is, in its terms, or by necessary effect, a discrimination against any other person or place.   It is not a stipulation that other shippers similarly situated should not enjoy the same rates.   This provision was simply an effort on the part of the Laurel Cotton Mills whereby it sought to protect itself against the imposition of greater rates than were charged by other carriers on similar shipments of manufactured products made by other cotton mills located at the places mentioned.   We are unable to see how a provision in a contract which merely limits the freight rate to be imposed to the amount imposed upon others engaged in similar business

can be construed to be a discrimination, within the meaning of
that term or under the interpretation placed upon it by the
supreme court of the United States.    This was not an effort
to secure an undue advantage to itself, but was a precaution to
guard against future imposition by advancing rates—a measure
the wisdom of which was demonstrated by subsequent events,
culminating in the present litigation.    It is not suggested any-
where in this record that at the date of this contract there was
any other shipper over the line of the Gulf & Ship Island Rail-
road Company then engaged in a business similar to that in
which appellant was about to embark, and it does not appear
that all other shippers, if any such there were, located on ap-
pellee's line of railway, where the services rendered would be
"like and contemporaneous," and where the transportation
would be effected under "substantially similar circumstances
and conditions," did not in fact enjoy the same rate which was
stipulated for on behalf of appellant in the contract in question.
And assuredly there is no express inhibition in the contract
which precludes the railroad company from granting a similar
rate to any other of its patrons who might thereafter engage in
a like business with appellant.    An unjust discrimination,
within the purview of laws for the regulation of commerce,
operates to the undue advantage of one person, and prejudicially
to the interest of some other person.    The contract under review
does not have that effect.    An agreement that one shall not be
charged more than a certain stated rate, but which does not
stipulate against or forbid the granting of the same rate to all
other persons, is not within the condemnation of the law pro-
hibiting discrimination.

Again, it is urged that this contract is void because the
"milling-in-transit arrangement" which is therein recognized
constitutes the granting of a rebate, which is unlawful, under
§ 4292, Code 1892, and is also violative of sec. 6 of the in-
terstate commerce law.    It is no longer open to question that
milling-in-transit arrangements are recognized as valid agree-

ments, which may be lawfully entered into between shippers and carriers. In the very recent case of *Central Yellow Pine Ass'n.* v. *V. S. & P. R. R. Co. et al.,* before the Interstate Commerce Commission, where the legality of milling-in-transit arrangements was considered in its various phases, it is said: "It is well understood that at the present time this principle is applied to the movement of many commodities. Generally, in its application, the raw material pays the local rate into the point of manufacture. When afterwards the manufactured product goes forward, it is transported upon a rate which would be applicable to the product had it originated in its manufactured state at the point where the raw material was received for transportation, whatever has been paid into the mill being accounted for in this final adjustment. Under this or some equivalent arrangement at the present time grain of all kind is milled and otherwise treated in transit; flour is blended; cotton is compressed; lumber is dressed, and perhaps otherwise manufactured; live stock is stopped off to test the market. It may be urged with much force that the act to regulate commerce does not sanction arrangements of this kind, and the commission, early in its history, intimated that such might finally be its conclusion. *Crews* v. *Richmond & D. R. Co.,* 1 Inters. Commerce Com. Rep., 401 (1 Inters. Com. Rep., 703). Such practices were, however, in use to a considerable extent at the time of the passage of the act, and since then they have become universal. To abrogate these privileges would be to confiscate thousands, and probably millions, of dollars in value, by rendering worthless industrial plants which have been constructed upon the faith of their continuation. Nor is it a forced construction of the statute to hold that, when the product goes forward to the point of consumption, it but completes the journey upon which it entered when the raw material was taken up. There can be no doubt that the application of this principle has cheapened the cost of transportation, and probably of manufacture."

The legality of the principle of milling-in-transit arrangements being recognized, whether each special agreement will be upheld depends upon the varying circumstances attendant upon its making; but it cannot be affirmed that such an agreement as is here under consideration can be declared to be, by its very terms, violative of the laws prohibiting unlawful rebates. There is no difference in principle between the plan agreed upon by the contract and other milling-in-transit arrangements which have been sanctioned and enforced by the interstate commerce commission in the transportation of many different commodities. In the instant case the fact that the entire freight paid upon the raw cotton is credited upon subsequent shipments of manufactured product does not vary the principle which controls and on which the validity of such contracts is based, and the arrangement is as valid and as binding as if it was simply an agreement such as is customarily in force. Whether the raw material pays the local rate into the point of manufacture and afterwards the manufactured product pays a lower rate, calculated from point of original shipment, or whether the raw material pays the local rate, and this is credited in whole or in part upon the transportation of the manufactured products subsequently shipped, result is the same in principle; the one being, in the language of the interstate commerce commission, "an equivalent arrangement" of the other, and neither contravening the mandate of the law devised to protect shippers from unjust discrimination, whether the same arises from extortion or from unlawful rebates granted to a favored few. So long as there is no unjust discrimination, and no stipulation in the contract forbidding the carrier extending similar rates to all other shippers similarly situated, there is no express provision of law, and no sound reason arising out of public policy, which prohibits a carrier entering into a fair and equitable milling-in-transit arrangement with any of the numerous industries now operating under such plans. "If there is no unjust discrimination, an agreement by a railroad

company that it will carry goods at a certain rate, and repay the shipper a part thereof as a rebate after the shipment, is not illegal, and the rebate may be recovered by the shipper in a proper case." Elliot on Railroads, sec. 1565; Rorer on Railroads, sec. 1375.

The clause in the contract by which a milling-in-transit arrangement is established between appellant and appellee does not seek to prevent the appellee effecting similar arrangements with all other patrons who may be or may hereafter be engaged in the same line of business. Nor does this contract, by any reasonable construction of its terms, necessarily work any unjust discrimination against any other cotton mills or dealers in cotton who may be located on appellee's line of railroad. It must be noted that the raw material pays full local rates into the place of manufacture, and the subsequent credit of such freight is only made upon shipments of manufactured product. If the raw material coming into the city of Laurel consigned to appellant should there be disposed of, either in its unmanufactured state or after it becomes the finished product of the mill, no portion of the local freight charges which have been paid upon such shipments at full tariff rates is credited to the appellant. The crediting of the freight paid is dependent upon whether the cotton is again shipped as manufactured product; so that, as to all shipments of raw cotton, the appellant fares neither better nor worse than do all others similarly engaged.

Before passing to the consideration of the next argument advanced by appellee in its assault upon the validity of this contract, it should be noted that sec. 6 of the interstate commerce act (U. S. Comp. St., 1901, p. 3156) and § 4292, Code 1892, do not deal with discriminations, as hereinbefore discussed. They were devised to secure uniformity of charges, by requiring all rates to be made public in a certain specified way, and then forbidding any change or deviation from the tariff so established. Sec. 6 of the interstate commerce act is fully complied with when the rates have been filed with the commission

and the tariff of charges has been duly published. When once established and promulgated, the tariff cannot be deviated from, either by increase or reduction of rates, until another schedule of rates has been legally adopted in the manner prescribed in said section. The interstate commerce commission is without power to fix rates, but any person considering a rate unjust or discriminatory may attack same as provided by law. The power to pass upon the reasonableness of existing rates which is vested in the interstate commerce commission does not necessarily imply the right to prescribe rates. *Cincinnati, Etc., Ry. Co.* v. *Interstate Com. Com., supra.* Under sec. 6 of the interstate commerce act rates may be changed at any time upon compliance with its provisions, when the carrier "shall promptly notify said commission of all charges made in the same;" but under § 4292, Code 1892, a schedule, once approved, established, and promulgated as therein provided, can be varied only when "such change or deviation be first allowed by the commission." The statutes, both state and federal, now under review, were designed to insure publicity of established schedules of rates, so that every patron might easily protect himself against extortion or discrimination by seeing that the carrier did not collect any greater compensation for the transportation of passengers or property "than is specified in such published schedule of rates, fares, and charges as may at the time be in force."

With these preliminary observations as to the purpose and scope of the statutes requiring promulgation of rates, and viewing them in the light of their intent, we pass to the next contention presented on behalf of appellee.

It is urged that the contract in question is void because in direct violation of sec. 6 of the interstate commerce act and § 4292, Code 1892, in that it allows a rebate or reduction from the tariff of charges fixed or approved by the commission by a change in or deviation therefrom. There are two plain answers to this argument: (1) It does not appear from anything

in the contract or in the declaration that, either by fixing the rates so as not to exceed those effective from Stonewall and Meridian or by entering into the millin-in-transit arrangement therein set out, were the rates fixed and approved by the interstate commerce commission or by the railroad commission of the state of Mississippi changed or deviated from in any particular. On the contrary, as the stipulations of the contract as to both the rates mentioned are valid in themselves, it may well be that these are the identical rates which have been filed with and published by the two commissions. Certain it is that in considering a contract legal in its terms, and violating no express statutory provision, and repugnant to no fundamental principle of public policy, a court is not authorized to indulge in the presumption that one party has ignored or violated the law, and thereby render the contract illegal and nonenforceable. If presumptions are to be indulged at all, they must be invoked in favor of the validity of a contract, and that the contracting parties have performed all legal obligations incumbent upon them, or necessary to effectuate the object which the contract had in view. Therefore, in the instant case, as the contract is, in its terms, valid and enforceable, provided the rates thereby fixed were submitted to the commissions as required by law, the presumption of law, if resort to presumptions was neces-. sary, would be that such rates had been fixed and approved, and that the contract was no deviation therefrom, and consequently no violation of the law prohibiting all deviations. (2) Again, it does not appear that any rates governing this subject-matter had been submitted by the appellant to either commission at the date of the contract; and as the contract, as to rates, did not go into effect until the mill began the operating and shipment of manufactured product made, it does not follow that these rates, even if not in force at the date of the contract, were not subsequently submitted to the interstate commerce commission, or that the change in rates, if change it was, had not first been allowed by the Mississippi railroad commission before

the rates were actually put in effect. This contract does not fall within that class expressly forbidden, except under certain exceptional circumstances, when it is incumbent upon the plaintiff to show that his contract falls within the exception. That character of contract is specially forbidden either by approved public policy or by express statute. This contract is not of that kind, for the reason that its terms in no wise transgress any provision of law; and if the appellee has itself complied with the legal duty imposed upon it in reference to the publication of its established schedule of rates, it is enforceable in all its terms.

The argument that the demurrers were properly sustained because the declaration failed to allege that the rates fixed in the contract sued on had been filed with the commission, or because it was not affirmatively shown that the consent of the Mississippi railroad commission had been first obtained, is unsound. The logical conclusion of the argument would be that as all rates are required to be filed with the proper commission, and then made public as its order may direct, a suit could be maintained on no contract for transportation of freight, without regard to the rates charged thereby, unless the plaintiff should allege that the carrier had discharged its duty in filing its schedule of charges, and then promulgating the same. The result of this would be to impose upon the plaintiff the burden of proving, in order to sustain a recovery, that the carrier had not violated the law or the order of the commission; the result being that the carrier would be enabled to defeat a valid contract by proof of its own sins of omission—a position manifestly untenable. It follows, therefore, that, in our judgment, the contract under review does not violate, by its terms or by any reasonable construction, any of the provisions of law invoked by the demurrers of appellee. It does not operate as a "discrimination" against any person or place, because it does not prevent the same rate being accorded to all. It does not unjustly discriminate in favor of appellant, because it grants it

no lower rate than is or may be granted to other shippers. It does not grant any unlawful rebate, because a milling-in-transit arrangement is in itself legal, and sanctioned by the interstate commerce commission as the legitimate outgrowth of the building of new enterprises. It does not violate the provision of law prohibiting deviation from published rates, because it does not appear that it is such a deviation. It does not violate the prohibition against altering the published rates without the permission of the Mississippi railroad commission first obtained, because it does not appear that it is any alteration, or that said permission, if necessary, was not obtained. It might be further said in this connection, as strongly persuasive of the view here announced as to the validity and enforceability of the milling-in-transit arrangement agreed upon by the contract between appellant and appellee, that the appellee itself for nearly a year recognized the validity of this arrangement, and complied with the terms of the contract in this respect. Yet, if the argument now pressed upon us be sound, and if this arrangement was the allowance of an unlawful rebate prohibited by law, the Gulf & Ship Island Railroad Company is liable, by its own argument, to all the penalties imposed for a violation of the statutes in this regard. Here is a contract which, according to the facts admitted by the demurrer, the Gulf & Ship Island Railroad Company for eleven months complied with, at least in part; granting, so the declaration avers, this crediting of freight upon subsequent shipments of manufactured products, when such action on its part was, if the argument be sound, a flagrant violation of the law. This is a peculiar attitude for a litigant to occupy—to seek to annul as illegal a contract of its own making, and of which it has reaped the full benefit, by pleading guilty to repeated and long-continued violation of the law, thereby endeavoring to escape liability for its own breach of contract. The contract, upon its face, is valid and susceptible of enforcement. It may be that, in its practical effect, it works unfairly and constitutes an un-

just discrimination. If so, it falls within the condemnation of the law. But whether or not this be its effect is a question, not of law, but purely of fact. *Texas & Pacific R. R. Co.* v. *Interstate Commerce Commission, supra.*

It may be that the contract is non-enforceable because an unauthorized deviation from established rates, but this is also a question of fact. We decide that the contract is not void upon its face, and decide nothing more.

*The judgment of the circuit court is reversed, the demurrer overruled, and the cause remanded.*